

# The Attorney General of Texas

**JIM MATTOX**
Attorney General

Supreme Court Building
P. O. Box 12548
Austin, TX. 78711- 2548
512/475-2501
Telex 910/874-1367
Telecopier 512/475-0266

714 Jackson, Suite 700
Dallas, TX. 75202-4506
214/742-8944

4824 Alberta Ave., Suite 160
El Paso, TX. 79905-2793
915/533-3484

1001 Texas, Suite 700
Houston, TX. 77002-3111
713/223-5886

806 Broadway, Suite 312
Lubbock, TX. 79401-3479
806/747-5238

4309 N. Tenth, Suite B
McAllen, TX. 78501-1685
512/682-4547

200 Main Plaza, Suite 400
San Antonio, TX. 78205-2797
512/225-4191

An Equal Opportunity/
Affirmative Action Employer

September 6, 1985

Mr. Kenneth H. Ashworth
Commissioner
Coordinating Board
Texas College & University System
P. O. Box 12788
Austin, Texas    78711

Opinion No. JM-352

Re: Whether a state institution of higher education may appoint to a faculty teaching position an individual who is nominated and salaried by a religious denomination

Dear Mr. Ashworth:

You ask whether a state institution of higher education may constitutionally appoint individuals who are nominated and salaried by a religious denomination to a faculty position to teach religious studies courses. If the answer to this question is affirmative, and the institution appoints the nominee of one or more religious denominations, you ask whether the institution may deny appointment to similarly qualified nominees of any other religious denomination. Your questions require this office to consider the scope of the clause of the First Amendment to the United States Constitution which declares that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof" and which applies to the states by virtue of the Fourteenth Amendment. Wallace v. Jaffree, 105 S.Ct. 2479 (1985).

Your letter indicates that North Texas State University initially requested authorization from the Coordinating Board of the Texas College and University System to transform the university's philosophy department into a department of philosophy and religious studies which would consist of the present philosophy department's faculty and of the holders of the six Bible chairs at the university. You state that, at present,

> Bible chairs are teaching positions maintained by religious organizations to provide courses on religion for university and college students. The religious organizations appoint and pay the salaries of the ministers or rabbis who occupy Bible chairs. They also own and maintain the off-campus facilities in which religion classes are taught. Although some public institutions do

p. 1605

not have Bible chairs associated with them, those
that do, permit students to apply from six to
twelve semester credit hours in religion courses
as electives toward their degrees.

The university's proposal, which you submitted with your request,
indicates that only religious organizations would submit nominations
for the new faculty positions to a university screening committee.
These positions would also be funded by religious organizations.
Accordingly, we will address your questions in the context of the
information you submitted to us, i.e. whether or not a state
university may appoint individuals who are nominated or salaried by a
religious denomination, regardless of whether the nomination is
conclusive.

It has been suggested that this type of position is merely "non-
stipendary" rather than salaried by religious denominations. As a
practical matter, however, either the religious denominations will
continue to pay the salaries of the teachers who would, under the
prior system, hold Bible chairs or the university must find teachers
willing to serve without pay. Further, you expressly ask whether such
positions may be salaried by religious organizations. The constitu-
tionality of both the method of appointment and the funding for the
proposed religious studies faculty concerns you.

As indicated, the First Amendment to the Constitution of the
United States forbids laws "respecting an establishment of religion,
or prohibiting the free exercise thereof." The United States Supreme
Court consistently interprets the First Amendment, as applied to the
states by the Fourteenth Amendment, to require that the states assume
a position of neutrality with regard to religion. Wallace, 105 S.Ct.
2479; Committee for Public Education v. Nyquist, 413 U.S. 756, 773
(1973); School District of Abington v. Schempp, 374 U.S. 203, 216
(1963). Your request requires application of the Establishment Clause
portion of this provision. The Establishment Clause proscribes
sponsorship, financial support, and the active involvement of the
government in religious activity. Grand Rapids School District v.
Ball, 105 S.Ct. at ____; 53 U.S.L.W. at 5008 (U.S. Jun. 25, 1985) (No.
83-990).

Analysis of the Establishment Clause must include consideration
of the three basic criteria developed over the years by the Supreme
Court. Id. at 5008. To pass muster under this clause the law or
government activity must, first, reflect a clearly secular government
purpose; second, have a primary effect which neither advances nor
inhibits religion; and third, avoid excessive government entanglement
with religion. Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971). The
United States Supreme Court reaffirmed the viability of this
three-part test in several recent cases. See, e.g., Grand Rapids

School District v. Ball, 105 S.Ct. 3216; Aguilar v. Felton, 105 S.Ct. 3232 (1985); 53 U.S.L.W. 5013 (U.S. Jun. 25, 1985) (No. 84-237); Estate of Thornton v. Caldor, 105 S.Ct. 2914 (1985); Wallace v. Jaffree, 105 S.Ct. 2479. As will be seen in the discussion to follow, the second and third of these criteria are the most plainly implicated in this case.

The study in public schools of the Bible specifically or of religion generally for literary or historic qualities as part of a secular program of education may be effected in a manner consistent with the Establishment Clause. School District of Abington v. Schempp, 374 U.S. at 225. Such courses, however, may not be taught in a manner which advances religion; they must focus on the nonsectarian aspects of religious history and writings. Hall v. Board of School Commissioners of Conecuh County, 656 F.2d 999, 1002 (5th Cir. 1981); see also Americans United for Separation of Church and State v. School District of Grand Rapids, 718 F.2d 1389 (6th Cir. 1983); aff'd, 105 S.Ct. 3216; Crockett v. Sorenson, 568 F. Supp. 1422 (W.D. Va. 1983); Wiley v. Franklin, 468 F. Supp. 133 (E.D. Tenn. 1979). Institutions of higher education stand on somewhat different footing from lower division schools because college students are presumed to be less impressionable and less susceptible to religious indoctrination than are elementary and secondary students. See Tilton v. Richardson, 403 U.S. 672, 685-86 (1971). Although university classes may involve discussion of the tenets of various religions more deeply than lower division schools, a state institution may not allow teachers of religious studies to proselytize in classes which are officially offered or sponsored by the university. Thus, despite the fact that the Establishment Clause clearly applies to religious studies courses at state institutions of higher education, offering such courses is not prohibited per se. We note, however, that even if a course is planned with a secular purpose, the ultimate test of whether it impermissibly advances religion depends upon actual classroom performance. See Hall v. Board of School Commissioners of Conecuh County, 656 F.2d at 1002; Wiley v. Franklin, 474 F. Supp. 525, 531 (E.D. Tenn. 1979).

In Wiley v. Franklin, 468 F. Supp. 133 (E.D. Tenn. 1979), the court dealt with a course of Bible study which was sponsored by city and county elementary schools. The court held that the use of a Bible study committee which, independent of school officials, established the Bible study curriculum and prescribed the selection, training, and supervision of Bible teachers, constituted an excessive entanglement in violation of the third prong of the Lemon v. Kurtzman test. The court in Crockett v. Sorenson, 568 F. Supp. 1422, came to the same conclusion in a similar factual setting. The courts in both cases required the school system to establish a plan under which school officials would -- without participation by any nonschool person or organization -- select, employ, train, and supervise all Bible

teachers.  Wiley, 468 F. Supp. at 151; Crockett, 568 F. Supp. at 1430-31; see also Wiley v. Franklin, 497 F. Supp. 390 (E.D. Tenn. 1980); Wiley v. Franklin, 474 F. Supp. 525 (E. D. Tenn. 1979).  Both courts emphasized that the qualifications for Bible teachers must be virtually identical to those applicable to other public school teachers.  474 F. Supp. at 528; 568 F. Supp. at 1431.  The Crockett v. Sorenson court further emphasized that no inquiry of the teacher's beliefs should be made.  568 F. Supp. at 1431.

With regard to the funding of Bible courses, both courts held that the school system was not prohibited by the Establishment Clause from accepting private contributions to fund the teachers' salaries and other expenses of the courses, but that such contributions must be made with "no strings attached."  468 F. Supp. at 152; 568 F. Supp. at 1431.  The private donors were not to be allowed to exercise control or even influence over the Bible teachers or over the Bible courses.  468 F. Supp. at 152.  A procedure, such as the one in question here, where the only salary a teacher could receive comes from a religious organization involves a certain degree of influence both over the availability of teachers and over the teachers who actually receive funding from religious organizations.

As will be shown in the discussion to follow, the two procedures at issue here, nominations by and salaries from religious denominations for university faculty, do not hold up under the rulings in these cases and in recent Supreme Court cases with regard to the excessive entanglement test.  Although institutions of higher education must receive somewhat different treatment than the lower division schools with which these cases dealt, the Establishment Clause clearly applies to universities.  See Widmar v. Vincent, 454 U.S. 263 (1981); Tilton v. Richardson, supra.  In Tilton v. Richardson, the Supreme Court upheld one-time, single-purpose federal construction grants for academic facilities at private institutions of higher education, including church-related institutions.  With regard to the excessive entanglement question, the court emphasized that the status of an institution as one of higher education reduces the risk of entanglement because less intensive government supervision is needed to determine whether religion actually permeates areas of secular education.  Tilton v. Richardson, 403 U.S. at 687.  The "non-ideological" government grants did not involve "any intimate continuing relationship or dependency between government and religiously-affiliated institutions."  Id.  The Court recognized that supervision of teachers requires more government involvement and hence involves a greater potential for excessive entanglement.  Id.; see Lemon v. Kurtzman, 403 U.S. at 619; see also Roemer v. Board of Public Works of Maryland, 426 U.S. 736 (1976); Hunt v. McNair, 413 U.S. 734 (1973).  A system whereby university faculty members are either nominated or salaried by religious organizations involves the type of

intimate continuing relationship between government and religion which is prohibited by the Establishment Clause.

In Aguilar v. Felton the Supreme Court relied upon the excessive entanglement criterion of the Lemon test and stated that

> [e]ven where state aid to parochial institutions does not have the primary effect of advancing religion, the provision of such aid may nonetheless violate the Establishment Clause owing to the nature of the interaction of church and state in the administration of that aid.

105 S.Ct. at ____; 53 U.S.L.W. at 5015 (U.S. Jun. 25, 1985) (No. 84-237). In Aguilar, publicly funded instructors taught classes composed of private school students in private school buildings. The case at hand presents an obverse situation in which religiously funded professors will teach official university classes composed of public university students.

Moreover, the second criterion of Lemon v. Kurtzman, prohibiting the advancement of religion, is also implicated in this case because of the strong potential for and the appearance of advancing or endorsing religion. See Americans United for Separation of Church and State v. School District of Grand Rapids, 718 F.2d at 1399; Hall v. Board of School Commissioners of Conecuh County, 656 F.2d at 1002. Presumably, the "nominations" of individuals for faculty positions by religious denominations will carry some weight, and if such "nominations" do influence the selection process, the effect of the selection process is to favor or endorse religion in general and the nominating religious denomination in specific. As the Supreme Court stated in Grand Rapids:

> Government promotes religion as effectively when it fosters a close identification of its powers and responsibilities with those of any -- or all -- religious denominations as when it attempts to inculcate specific religious doctrines. If this identification conveys a message of government endorsement or disapproval of religion, a core purpose of the Establishment Clause is violated.

105 U.S. at ____; 53 U.S.L.W. 5006, 5010 (U.S. Jun. 25, 1985) (No. 83-990).

For these reasons, we conclude that the Establishment Clause prohibits a state university from appointing individuals who are nominated by or funded by a religious denomination to a university faculty position to teach religious studies courses. These processes

involve an excessive entanglement between the university and religion. They also involve the potential for and the appearance of advancing, endorsing, or favoring religion.  The university may certainly offer courses on religion for academic credit, but it must structure the selection of teachers for such courses in a manner which does not differ from the way in which it selects the teachers for all of its other academic courses.  The university is not prohibited by the Establishment Clause from accepting private donations to fund such courses, i.e. by accepting funding to set up a "Bible Chair"; however, the donors may not be permitted to exercise control or influence over religious studies courses or professors.

## S U M M A R Y

The Establishment Clause of the First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, prohibits a state institution of higher education from appointing individuals who are either nominated or salaried by a religious organization to a university faculty position to teach religious studies courses.  These processes involve excessive entanglement between the university and religion and involve the potential for and the appearance of advancing, endorsing, or favoring religion.

Very truly yours

JIM   MATTOX
Attorney General of Texas

TOM GREEN
First Assistant Attorney General

DAVID R. RICHARDS
Executive Assistant Attorney General

ROBERT GRAY
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Jennifer Riggs
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Rick Gilpin, Chairman
Susan Garrison
Tony Guillory
Jim Moellinger
Jennifer Riggs
Nancy Sutton
Sarah Woelk